GARDEN, JUDGE:
On November 3, 1972, the respondent entered into a contract with Kenneth M. Dunn Co., Inc., Day Construction Company and Orders Construction Company, Inc., whereby the latter companies agreed to construct, in accordance with plans and specifications furnished by respondent, the Fort Gay — Nursery Gap Road in Wayne County, Project No. S-617 (18), and commonly referred to as a portion of the Tolsia Highway. The contract also effected a relocation of the then existing County Road 29 or Mill Creek Road.
The claimants were the owners of certain real estate that fronted on Mill Creek Road. Running parallel to the Mill Creek Road was a small creek, and during good weather and when the water level in the creek was low, the claimants in order to reach their residence would simply drive their car off of Mill Creek Road, ford the creek and then proceed over bottom land a distance of some 200 to 300 feet, up a small embankment and park next to their home. At times when the water level in the creek was high and the bottom land was flooded, the claimants would park their car off of Mill Creek Road, cross the creek by means of a pedestrian bridge and then walk the remaining distance to their home. At the time of the hearing William Glen Ratcliff and Thelma Ratcliff were 75 and 68 years of age respectively.
The plans for the new road relocated the then existing Mill Creek Road to a point on the other side of the creek and very near the residence of the claimants and generally bisected the property of the claimants. At and near the home of the claimants the plans also required an extensive amount of fill for the road bed, and as a result the level of the newly constructed highway exceeded the elevation of claimants’ home. It was admitted by respondent at the *292 hearing that the plans did not specifically provide for a road or anything else which could be used by claimants as a means of ingress and egress during construction, although the plans did provide for permanent access after construction and which was later actually provided.
The claimants had left their home on the morning of May 24, 1973, so that Mrs. Ratcliff might keep an appointment with her doctor. She testified that the fill for the roadbed at that time was twelve to fifteen feet in height. The fact was disputed by respondent, but from pictures of the roadbed taken a few days later and which were introduced into evidence, we believe that the testimony of Mrs. Ratcliff is entitled to the greater weight. It had rained the day before and was raining again when the claimants returned from the visit to the doctor about 11:30 a.m. No means of ingress or egress having been provided for them, the Ratcliffs attempted to climb up and over the fill and in so doing Mrs. Ratcliff fell and sustained severe personal injury to her left knee.
The respondent introduced into evidence Section 104.5 of the West Virginia Department of Highways Standard Specifications- — Roads and Bridges — adopted 1972, which reads in part as follows:
“The Project, while undergoing improvement, shall be kept open to all traffic by the contractor in such condition that both local and through traffic will be adequately and safely accomodated.”
The respondent contends, pursuant to the above, that it was the duty of the contractor to provide the Ratcliffs with a means of ingress and egress to their property, and that it therefore had no duty in this respect to the Ratcliffs. We are not certain that the above-quoted section specifically covers the providing of ingress and egress to individual residences such as the Ratcliffs. Even if it does, we are of opinion that the respondent has a duty to provide ingress and egress and that such duty is non-delegable. A right of access to and from a public highway is a property right of which a property owner can not be deprived without just compensation. State ex. rel. Riddle v. Department of Highways, 154 W.Va. 722, 179 S.E. 2d 10 (1971). Respondent also contends that the Ratcliffs were guilty of assumption of risk in attempting to climb the fill in adverse weather conditions when the fill was slippery. As indicated above, climbing the fill was the only course that they could follow to reach their home. To be guilty of assumption of *293 risk, a voluntary exposure must take place. Acceptance of risk is not voluntary if a defendant’s tortious conduct has left a plaintiff no reasonable alternative course of conduct in order to avert harm to himself. 57 Am. Jur. 2d, Negligence *283. We are of opinion that the respondent was guilty of negligence in failing to provide access or in failing to see that access was provided for the Ratcliffs during the construction of this highway and that such negligence was the proximate cause of Mrs. Ratcliffs fall and resultant injuries. We are of the further opinion that the Ratcliffs were not guilty of assumption of risk.
Counsel for the parties during the hearing stipulated that the Ratcliffs had instituted a civil action against the contractors, Kenneth M. Dunn Co., Inc. and Day Construction Company, but that before trial a settlement had been effected whereby the Ratcliffs received $18,000.00 in settlement of their claims. This of course does not prevent the Ratcliffs from pursuing their claims against the respondent in this proceeding. Had the civil action been proceeded to trial and a verdict, later satisfied, been returned in the Ratcliffs’ favor, that would have barred this proceeding, for an injured plaintiff is entitled to only one satisfaction for a personal injury. On the other hand it is clear that any award that we might make must be reduced by the amount of the settlement previously paid by the joint tort feasors.
As a result of her fall Mrs. Ratcliff experienced immediate pain in her left knee. She was seen the following day by her family physician, Dr. Lester of Louisa, Kentucky, who referred her to Dr. J. Marshall Carter, an orthopedic specialist of Huntington, West Virginia. An evidentiary deposition of Dr. Carter was read into evidence, and it was the doctor’s opinion that Mrs. Ratcliff at the time of her fall had an advanced osteoarthritic condition in both knees. He was of the opinion that, she possibly tore the medial cartilage of her left knee and that the fall aggravated the osteoarthritic condition and triggered an on-set of pain. Dr. Carter saw Mrs. Ratcliff a total of nineteen times prior to the hearing of this claim. On at least seven of these visits the doctor injected her knee with cortisone. He also fitted her with an elastic knee cage. The doctor was of opinion to a reasonable degree of medical certainty that the fall aggravated her pre-existing condition and that she would suffer pain and experience difficulty in walking the rest of her life. Dr. Carter’s bill was in the amount of $878.00, which in his opinion was reasonable and necessary.
*294 Mrs. Ratcliff testified that prior to her fall she had no trouble in walking, but she admitted that her knees would bother her if she were working on her feet for an extended period of time. Since the fall she testified that she has been in constant pain and takes Darvon five or six times a day in an effort to control the pain. She is unable to do her house work and estimated that she had spent $2,000.00 in hiring help to do this work. While she is able to move around a little bit, she testified that she must use her knee brace and a cane.
Prior to her fall two young grandchildren were living with her, children of her widowed daughter. Her daughter was paying her $200.00 a month for this service, but shortly after the fall it became necessary to place the children elsewhere because of Mrs. Ratcliffs inability to physically take care of them.
Pain and suffering is the largest element of damages in this claim and is of course most difficult to equate in a monetary figure. In view of all of the facts in respect to this physical injury, we feel that an award of $22,500.00 is justified, and crediting the respondent with the $18,000.00 settlement, we hereby make an award of $4,500.00.
Award of $4,500.00.